**VANADIUM CORPORATION OF AMERI-CA v. FIDELITY & DEPOSIT CO. OF MARYLAND et al.**

No. 26, Docket 20259.

Circuit Court of Appeals, Second Circuit.

Jan. 6, 1947.

Dwight R. Collin, of New York City (Chadbourne, Wallace, Parke & Whiteside, and Virginia M. Simpson, all of New York City, on the brief), for appellant.

Milton Pollack, of New York City, for appellees.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This action against a surety on a bond securing performance of a contract of sale of mining leases was originally brought in the Supreme Court of the State of New York and came to the district court below through removal by defendant because of the diverse citizenship of the parties. The principal on the bond, Horace Ray Redington, then intervened as a party defendant. Since the contract of sale was not completed, plaintiff vendee by its terms became entitled to repayment of the consideration paid in advance of $13,000, unless its own acts justified defendants' refusal to make the refund. Accordingly the issues below concerned the defenses raised by defendants that plaintiff had refused that co-operation required by law in obtaining completion of the contract. These defenses, three in number, were upheld as legally sufficient by the District Court against attack by motions before and after verdict and by requests to charge. The jury having found for defendants, this appeal from the resulting judgment brings the issues of the validity of the defenses before us.

The two original mining leases were made in 1939 and 1940 to three lessees, John F. Wade, Thomas F. V. Curran, and Redington, and covered various lands belonging to the Navajo tribe of Indians in the Navajo Reservation in Arizona. The lands produced vanadium-bearing ore, vanadium being a critical war material. Since Indian lands were involved, all transfers required the approval of the Secretary of the Interior. 25 U.S.C.A. § 396a et seq.; 25 CFR § 186.26. The contract here in question was made by Redington with plaintiff on June 3, 1942. By it, in return for the payment of $13,000 which he acknowledged, Redington assigned to plaintiff his interest in the two leases, "subject only to approval by the Secretary of Interior." It also contained a provision that in the event the assignments were not approved, Redington would repay the purchase price and the agreement would be deemed cancelled. Redington further agreed to furnish a bond with appropriate surety for the return of the money in the event that his assignments "aforesaid shall not be approved by the Secretary of Interior of the United States within a period of six (6) months from the date hereof." At the same time Redington executed formal assignments of his interests in the leases, and he and the corporate defendant executed the bond in suit. By the latter the principal and surety bound themselves to return all amounts paid Redington "under protection of this bond." It also provided that plaintiff should be held harmless against all loss or damage arising "by reason of any invalidation of this purchase agreement."

From the beginning, however, it appears that the stumbling block was the unwillingness of the other two owners to go along with plaintiff's plans. But plaintiff was not in the dark as to this situation; while it held only an option from, and before closing with, Redington, it had approached the other owners for a purchase of their interest, and had been refused. After taking the assignments from Redington, plaintiff tried to reopen negotiations with the others, either for purchase or for joint operations of the mines; but its proposals were again repulsed. Under date of June 7, 1942, Curran notified it that Wade, acting for all the owners, had made a contract with the Metals Reserve Corporation (a government corporation) for the entire output of ore from the properties for the duration of the war. Curran added that they would do all possible to get the largest possible tonnage from the leases, on their contract with the Metals Reserve Corporation, and "will welcome any aid you may give that will promote this end." It is defendants' contention that this information

as to the prior right of the Metals Reserve Corporation to the output caused plaintiff's desire for the Redington interests to cool; and this disposal of the output obviously ran counter to plaintiff's program of securing a large flow of ore to a government-financed processing plant at Monticello, Utah, being built for operation by plaintiff on a fee basis. Plaintiff denies any lack of co-operation, calling attention to its general offers otherwise appearing as late as August 28, 1942, in a letter of that date to the Assistant Commissioner of Indian Affairs. But so far as an issue of fact was presented, that was resolved by the jury against the plaintiff.

Actually the proof adequately supported the allegations of fact of all the defenses. These were, first, that plaintiff refused reasonable assurances to the Department of an intent to co-operate with Curran and Wade in an amicable operation of the mines; second, that prior to November 18, 1942, it withdrew its request for approval of the assignments and caused the Department to withhold approval; and, third, that after November 18, it prevented reconsideration of the disapproval already made. Thus when the Assistant Commissioner notified plaintiff by letter of September 4 of the official intent to disapprove the assignments because of plaintiff's failure to work out an operating agreement with Curran and Wade, plaintiff's immediate reaction was to perfect its rights against the surety by formal demand upon the latter and by request to the Department for final certification of the Secretary's disapproval. True, it acknowledged the communication from the Assistant Commissioner by letter of September 8; but this, like other acts of the plaintiff during the period, was subject to various interpretations, depending upon the background. For in this acknowledgment it expressed regret at the withholding of approval, since it had hoped to increase production of vanadium ore by "our co-operation" with the owners of the leases and that the maximum amount of ore would be removed from the claims, tendered "any assistance that we may properly offer to accomplish that end," and closed by stating that it was "immediately notifying" Redington and taking steps to secure the return of funds it had advanced. Further, there was evidence that in October it refused to give the assurances desired by the Department of its intent to co-operate with the other owners, but indeed went so far as to tell the General Superintendent of the Navajo Service in Arizona of its lack of further interest in the assignments. Accordingly the Assistant Secretary of the Interior, acting on a recommendation from the office of the Department Solicitor reciting that the officers of plaintiff had stated that they were no longer interested in obtaining the assignments, formally disapproved the assignments November 18, 1942.

The evidence is yet more direct on the issue that plaintiff prevented reconsideration of the disapproval after November 18, 1942. Here plaintiff's position is that its rights became fixed on that date and that later reconsideration could not affect them. It is not contested that the Assistant Secretary, on the appeal of Redington and his counsel, was prepared to reconsider the matter if the plaintiff would go along, and so wired plaintiff's president on November 28, saying that the disapproval was "being reconsidered with view to approving assignments. Wire your position," to which plaintiff's answer, November 30, was, "Our position therefore must be to respectfully request no reconsideration of your position." And so the Assistant Secretary on December 3 notified the parties that without "a joint request for reconsideration by both parties to the assignment," no further consideration could be given the matter. Plaintiff now argues that it understood the original assignments and contract to be dead, and hence was refusing merely to enter into an entirely new contract, not interfering with approval of those assignments or preventing fulfillment of the original conditions. But this seems only a different verbalization of its same argument that the time period granted for performance in the contract must be further restricted by an earlier disapproval by the Secretary. Of course it overlooks completely the Assistant Secretary's explicit statement that the

action *disapproving* the Redington *assignments* was being reconsidered with a view to approval.

■ On the record, therefore, there seems to be no doubt of the plaintiff's complete disinterest in the Redington assignments at this time. But clearly it is in error in asserting that the rights of the parties became finally fixed on November 18, 1942. For the explicit provision of the contract, calling for the bond here in question, required only refund of the consideration if the Secretary did not approve within six months, i. e., by December 3, 1942. Nothing is said to suggest that the period is shortened by an earlier notice of disapproval. Particularly under the circumstances here where the Secretary was prepared to reconsider, it would be harsh to add to the contract such a provision which the parties themselves did not choose to incorporate in it. The District Court was correct in considering the third defense as on the same plane as the others.

■ The question therefore is reduced to that of the extent of plaintiff's legal duty in the premises. Professor Williston says that "wherever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied in fact that the cooperation will be given." 3 Williston on Contracts, Rev.Ed.1936, § 887A, p. 2495. See to the same effect, § 677, p. 1956; 2 Restatement, Contracts, 1932, § 395, comment c. Here an obligation to attempt in good faith to secure the prerequisite of the Secretary's approval would appear to rest upon both parties. Creamer v. Metropolitan Securities Co., 120 App.Div. 422, 105 N.Y.S. 28; Murphy v. North American Light & Power Co., 2 Cir., 106 F.2d 74, 80; Unity Co. v. Gulf Oil Corp., 141 Me. 148, 40 A.2d 4, 156 A. L.R. 297; Lord v. Tyler, 31 Mass. 156; Atlantic City v. Farmers' Supply & Products Co., 96 N.J.L. 504, 115 A. 388. Indeed plaintiff may well have the heavier burden, for, as its counsel contended at the trial, it seems that the assignee must file the assignment for approval and apparently no one else can legally do so. It was surely not the intent of the parties when they made an apparently binding assignment that the plaintiff should have the power to invalidate the assignment by not filing it for approval. On the contrary, it must have been assumed that plaintiff would seasonably file it and in good faith seek its approval. Silverman v. Isaac Goldmann Realty Corp., 232 App.Div. 292, 249 N.Y.S. 505. And plainly plaintiff was obligated to refrain from positive actions to prevent approval by the Secretary. Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472; Carns v. Bassick, 187 App.Div. 280, 175 N.Y.S. 670; Irving Trust Co. v. Park & Tilford Import Corp., 250 App.Div. 570, 294 N.Y.S. 822. Hence on the facts, as the jury could and did find them, the defendants' contractual duty herein was discharged by plaintiff's breach of a condition precedent. 2 Restatement, Contracts, 1932, § 395.[1]

The court's denial of the plaintiff's various motions and requests to charge and its submission of the case to the jury with a brief, but adequate, charge were therefore without error. There remain for consideration certain rulings of the court in admitting evidence over the plaintiff's objection. Some of these objections were to documentary material relating to happenings between November 18 and December 3, 1942; but we have already pointed out that this period was fully as crucial as any other part of the six months' interval allowed by the contract for securing the Secretary's approval. The remaining objections concern documents produced from the files of the Department of the Interior and admitted as official records. Plaintiff contends, however, that they contained inadmissible hearsay and should therefore have been rejected. The point thus presented is one of interest and importance.

The documents objected to are interdepartmental communications between Chapman, Assistant Secretary of the Interior in

---

[1] Conceivably plaintiff might have sought restitution from Redington of a part of the purchase price, on the ground of disproportionate loss otherwise to it, compare 2 Restatement, Contracts, 1932, § 357; Corbin, The Right of a Defaulting Vendee to the Restitution of Installments Paid, 40 Yale L.J. 1013, 1023, but no such issue is presented on this record.

Washington, and Zimmerman, Assistant Commissioner of Indian Affairs in Chicago, and between Zimmerman and Stewart, the General Superintendent of the Navajo Agency in Arizona. They hardly add anything beyond the official communications discussed above, but do afford corroborating evidence of the departmental attitude and willingness to approve the assignments if co-operation of the owners could be assured, as well as of admission by plaintiff's officers as to their lack of interest. Since under Federal Rules of Civil Procedure, rule 43(a), 28 U.S.C.A. following section 723c, the rule of most extensive admissibility, state or federal, is applicable, there are several available statutes allowing proof of official records by copies officially attested as here. See 25 U.S.C.A. § 6 (dealing with the records of the Indian Office); 28 U.S.C.A. § 661 (general); N. Y. Civil Practice Act, §§ 382, 400 (state and federal public records); and cf. Federal Rules of Civil Procedure, rule 44 (proof of official record), and the numerous statutes cited in the Committee Notes to this rule. But, as Wigmore points out, the "official statements" exception to the rule excluding hearsay is "good common law," though, as he adds, "the numerous petty statutory rules have made the Bar suppose that they must always find a statute." 5 Wigmore on Evidence, 3d Ed. 1940, § 1638a. Actually this exception is recognized because of necessity or the inconvenience which would result from always requiring the testimony of the official in person to the facts he has recorded; and his official duty supports the requirement that there be found some circumstantial probability of trustworthiness. Id. §§ 1630–1633; Richardson on Evidence, 2d Ed., § 591.

But the statutes merely provide for the method of proof of the records and do not settle their admissibility in a particular case, as proving or tending to prove the truth of the matters stated in them. Since, however, they are a substitute for the appearance of the public official himself, a natural limitation, so far as they deal with observed facts, is that they must concern matters to which he himself could have testified in person. As applied here, they should refer to matters such as admissions of the parties concerning the facts in issue or official action taken and the grounds therefor. These are facts as to which the officer himself could have been subpoenaed to testify (of course to the inconvenience or disruption of the public service). Wigmore states the rule as turning upon the official's duty to act, that "wherever there is a duty to do, then there is also an implied duty to record the things done." 5 Wigmore on Evidence, 3d Ed. 1940, § 1639, with extensive citation of cases. See also A. L. I., Model Code of Evidence, 1942, Rule 515.[2] Supporting authorities are to be found in both federal and New York practice. Village of Evanston v. Gunn, 99 U.S. 660, 25 L.Ed. 306; Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 128, 39 S.Ct. 407, 63 L.Ed. 889; In re Webster, 106 App.Div. 360, 94 N.Y.S. 1050, affirmed 186 N.Y. 549, 79 N.E. 1118. Cases relied on by the plaintiff are instances outside the above principles, as where the officer has no duty in the premises and the record shows merely the untrustworthy hearsay of someone else. Greenbaum v. United States, 9 Cir., 80 F.2d 113; United States v. Smart, 5 Cir., 87 F.2d 1; Maher v. Empire Life Ins. Co., 110 App.Div. 723, 96 N.Y.S. 496;

---

[2] Actually the Code is still more specific, since it holds admissible as "tending to prove the truth of the matter stated therein," a report "or memorandum of facts and conclusions concerning an act, event or condition" made in the performance of his duties by an official whose function it is to "observe the act, event or condition," or "investigate the facts concerning the act, event or condition and to make findings or draw conclusions about it." Rule 515. Protection is given the adverse party by Rule 519, by which the judge has discretion to refuse admission if such party has not had reasonable advance notice, and thus opportunity to summon the maker or the persons upon whose information it is made. See comment a, Rule 515. Here such advance notice appears to have been given, and plaintiff might therefore have taken the testimony or deposition of the Assistant Secretary or other officials if it was disposed to challenge the record testimony.

Davis v. Supreme Lodge, Knights of Honor, 165 N.Y. 159, 58 N.E. 891.

Here the record shows that the district judge considered each exhibit with the greatest care and actually excluded the more controversial material, indeed going further this way than he needed. Of the exhibits admitted, two were an exchange of communications between Chapman and Zimmerman, November 21 and 23, 1942, the one asking for a recall of the file, the other showing compliance—so innocuous in fact that no objection was made to the first, and the only objection to the second was lack of materiality. Then there was an exchange of letters in October between Zimmerman and Stewart, only admitted in part and, except for one detail, showing only the steps already taken as to the Redington assignments. That one detail was separately admissible as an admission by plaintiff's responsible officers—the "flat" statement of plaintiff's lack of interest in obtaining the assignments which has been previously cited. Finally there were Chapman's telegram to Zimmerman of November 28 that he believed "now approval assignments will promote development and further interests government and Indians," concluding, "Wire recommendation," and Zimmerman's response that his recommendation of disapproval had been because plaintiff "could not make amicable operating arrangement with Wade and Curran," adding, "Recommend approval if appears to you situation has changed so such arrangement could be made."

It is to be noted that these are more than the mere report of some action already taken—"past recollection recorded"—but are the very fabric of decision itself. Had the Assistant Secretary incorporated all this in an opinion reciting the steps he took and the grounds therefor, this would fall within Wigmore's statement last quoted; and undoubtedly the Assistant Secretary, in these days of critical examination of administrative action, would have been commended for his care and industry. Here, however, we have brought before us the very steps as made, leading to the decision which he announces to the parties with his reasons. His duty to hear

and consider is therefore beyond dispute. And the evidence concerns the crucial issue of the reasons for his failure to approve. Since he himself stated his reasons, growing out of this very material, to the parties in announcing his decision, the evidence might perhaps have been objected to as only cumulative. But its relevancy is clear.

Affirmed.