**Rachel WETHERILL, Plaintiff,**

v.

**UNIVERSITY OF CHICAGO, et al., Defendants.**

No. 77 C 1434.

United States District Court, N. D. Illinois, E. D.

July 23, 1981.

Paul F. Stack, Jacqueline Lustig, Stack & Filpi, Chicago, Ill., for plaintiff.

Richard C. Bartelt, Max E. Wildman, Kay L. Schichtel, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Lane D. Bauer, Steven C. Parrish, Anne E. Goos, Shook, Hardy & Bacon, Kansas City, Mo., for Eli Lilly & Co.

John Cadwalader Menk, John Cadwalader Menk & Associates, James W. Gladden, Jr., Mayer, Brown & Platt, Chicago, Ill., for University of Chicago.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Rachel Wetherill ("Wetherill") brings this diversity action for injuries allegedly resulting from her mother's ingestion during pregnancy of the drug diethylstilbestrol ("DES"). In 1978 the United States Department of Health, Education and Welfare ("HEW," now the Department of Health and Human Services) published a report (the "Report") prepared by an ad hoc task force established to study the effects of DES. Wetherill has moved in limine for an order holding the Report admissible under Fed.R.Evid. ("Rule") 803(8). For the reasons stated in this memorandum opinion and order that motion is denied.

*The Report*

In 1978 HEW Secretary Joseph Califano responded to growing concern over the effects of DES by directing Surgeon General Julius Richmond to establish a task force to study the subject. Authority for the task force was sought to be drawn from 42 U.S.C. §§ 241 and 282:

*Section 241—Research and Investigations Generally.* The Surgeon General shall conduct in the Service, and encourage, cooperate with and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man. . . . *Section 282—Powers and Duties of the Surgeon General* . . . (a) In carrying out the purposes of Section 241 of this Title with respect to cancer the Surgeon General, through the National Cancer Institute and in cooperation with the National Cancer Advisory Board, shall—(1) conduct, assist, and foster researches, investigations, experiments, and studies relating to the cause, prevention, and methods of diagnosis and treatment of cancer; (2) promote the coordination of researches conducted by the Institute and similar researches conducted by other agencies, organizations, and individuals. . . .[1]

To comprise the task force the Surgeon General assembled a group of doctors and experts employed with various departments of the federal government. It was chaired by the Director of Cancer Control and Rehabilitation at the National Cancer Institute, Dr. Diane Fink. In addition to the task force members themselves, a large group of consultants participated actively in preparing the Report. That consultant group consisted of both doctors and non-professionals, several of whom were active in organized efforts to expose the allegedly harmful effects of DES. It included Phyllis Wetherill, plaintiff's mother, Dr. Sidney Wolfe, Director of Health Research Group (a Ralph Nader organization), Barbara Seaman (see n.5) and Fran Frisbane, President of DES Action. There was no representative of the pharmaceutical industry either on the task force or among the consultants.

Neither the Surgeon General nor the task force viewed its function as the conduct of original research. Instead it reviewed available information on DES (both published and nonpublished) and, after round table discussion, voted on recommendations. Its goals and methods of procedure are best summed up in the letter from Dr. Fink to Dr. Richmond accompanying the submission of the Report:

The Task Force began its deliberations on March 3, 1978. It followed the charges you outlined in the original responsibilities to the Task Force, namely:

*To review*—all aspects of the DES question and to develop recommendations regarding health issues of DES and research gaps which exist.

*To advise on* —

1. the recent observation of a possible association of breast cancer (and other tumors) in DES mothers,

2. the use of DES as a post-coital contraceptive,

3. the abnormalities of the reproductive tract in DES male offspring,

4. cancer and other tissue changes in DES female offspring, and

5. other early observations on the health effects of DES.

The Task Force met on eight occasions to deal with the health effects of DES. Minutes of these meetings are available. A wide variety of persons presented data and views to the task force. The task force examined existing studies and discussed action recommendations as well as the scientific bases of the action recommendations. It evaluated "gap" areas and recommended further research re-

---

1. Application of Section 282 was appropriate because there was concern that cancer might be one of the effects of ingesting DES.

quired to settle these "gap" areas definitively.

### Admissibility

Because the Report is plainly hearsay, Wetherill seeks its introduction under the exceptions stated in Rule 803(8)(B) and (C):[2]

(8) *Public Records and Reports.* Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ... or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

### 1. *Rule 803(8)(B)*

In literal terms Rule 803(8)(B) does not support Wetherill's position. It applies only to "matters *observed*," while Wetherill seeks to introduce a document based entirely on round table discussions of the observations of *others.* Substantially all the cases applying Rule 803(8)(B) involve documents reflecting the personal observations of government officials or their subordinates. *See, e. g., Schwartzberg v. Califano,* 453 F.Supp. 1042, 1046 (S.D.N.Y.1978) (inspection report of a health care facility); for a pre-Rule case applying the same concept of inherent trustworthiness, see *United States v. Meyer,* 113 F.2d 387, 397 (7th Cir. 1940), *cert. denied,* 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (map prepared by government engineer from information furnished by man working under his supervision).

Some few cases decided before adoption of Rule 803(8) did permit the introduction of reports by governmental officials based on information or reports made by non-governmental persons with first hand knowledge. This was true of the one case cited by Wetherill in support of her motion under Rule 803(8)(B), *Smith v. Universal Services, Inc.,* 454 F.2d 154, 157 (5th Cir. 1972) (admitting into evidence an "EEOC report, consisting of a summary of the charges, a brief review of the facts developed in its investigation, and its findings of probable cause that violations exist...."). *Smith* may be distinguished because the EEOC investigator there actually interviewed witnesses who had themselves observed the reported events. It might be argued that a trained EEOC investigator can elicit from an eyewitness factual observations while excluding the witness' subjective assessment of the events. Those eyewitness accounts, in essence, become facts for consideration by the investigator.

But here the Report was based in large part on the task force's evaluation of the results of the experiments as themselves interpreted by sophisticated scientists. Moreover the task force also relied on many informal sources of evidence that were not based on first-hand observation. There is obviously a greater degree of trustworthiness in a report prepared by a trained EEOC investigator from lay accounts of an incident than in a task force's assessment of work done by experts combined with its evaluation of material from a wide variety of other non-expert sources.

But this Court finds a fundamental problem with the *Smith* approach. Both the business records and the public records exception to the hearsay rule are grounded on the premise of trustworthiness—the notion that reports prepared by those with a *duty* to do so were inherently trustworthy. As Judge Weinstein has noted (4 Weinstein's Evidence ¶ 803(8)[02], at 803–198):

When the statement was furnished by a layman without any duty to report, the requisite guarantees of reliability neces-

---

**2.** Because other requirements of the Rule are not satisfied for the reasons stated in this opinion, this Court does not deal with the question whether the Report was the product of a "public office or agency" within the Rule's meaning or purpose. Under the circumstances of the Report's compilation and in view of the input from nongovernmental sources, that issue is also open to some doubt.

sary for the official records exception to apply were missing, unless some other hearsay exception might be satisfied. . . .

Judge Weinstein characterizes cases such as *Smith* as the "ad hoc official" exception to the hearsay rule and concludes his discussion of the history of the Rules thus (*id.* at 803–199):

> This history would indicate that the Advisory Committee did not intend to include reports by ad hoc officials within the coverage of Rule 803(8).

■■ Rule 803(8)(B) imposes a twofold duty requirement: the *observation* must have taken place pursuant to a legally imposed duty, and the *matters themselves* must have been the subject of a reporting duty. In the absence of controlling authority in our Circuit, this Court therefore holds that Rule 803(8)(B) permits the introduction of a public record only if it is made from matters within the personal knowledge of (1) a public official making the report (or his agent) or (2) someone with a duty to report the matter to a public official.[3] Accordingly the Report is inadmissible because it is based on evidence from numerous non-official sources, many of whom obviously had no "duty imposed by law" to report such information. Inasmuch as the recommendations of the Report are based on an assessment of *all* the information gathered, without differentiating between matters that are and that are not the subject of a legal duty, the Report as a whole cannot be admitted under Rule 803(8)(B).

### 2. *Rule 803(8)(C)*

■ Rule 803(8)(C) applies only to investigative reports based on "factual findings."

In contrast the Report was based on an assessment and discussion of the literature relating to DES based on and coupled with the personal opinions of the members of the task force and the consultants. It is plain that the task force never undertook or intended to undertake a factual investigation of the effects of DES. In fact, one of the stated goals of the undertaking was to identify "gaps" in the existing research and make recommendations for further research to fill in those interstices.

"Factual findings" as used in Rule 803(8)(C) has been and should be given an expansive reading. *See*, 4 Weinstein's Evidence ¶ 803(8)[03], at 803–204, 803–205. But to date no court has permitted the introduction of a survey of existing data such as contained in the Report. Contrast such cases as *Smith v. Ithaca Corp.*, 612 F.2d 215, 221–22 (5th Cir. 1980) (factual investigation into the cause of an explosion aboard a ship); *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39, 96 S.Ct. 1949, 1961 n.39, 48 L.Ed.2d 416 (1976) (findings of an administrative agency after an *adjudicatory hearing*).

Indeed, even an investigative report that (unlike the Report here) meets the requirements of Rule 803(8)(C) is still inadmissible if "the sources of information or other circumstances indicate lack of trustworthiness." As an independent ground for denying admission of the Report, this Court finds it to be untrustworthy. While there are a great many factors that independently render the Report untrustworthy,[4] this Court is particularly troubled by the pres-

---

**3.** In *United States v. Harris*, 446 F.2d 129 (7th Cir. 1971), *cert. denied*, 404 U.S. 994, 92 S.Ct. 533, 30 L.Ed.2d 546, the Seventh Circuit upheld the admissibility of a letter in a Selective Service file from a hospital, stating that the defendant had failed to report for civilian work at the hospital. That document was admitted without the Court's having determined whether the hospital was under a duty to report such activity to the Selective Service Commission. But that case involved a predecessor to Rule 803(8)(B), 28 U.S.C. §§ 1732, 1733, and given Judge Weinstein's discussion of the legislative history of the Rule the case is no longer controlling. Moreover, the Court specifically pointed out that at trial there was no "evidence offered . . . which tended to contradict the Selective Service files' representation that Mr. Harris had failed to report. . . ." It went on to say that had Mr. Harris contested that issue "we would be alarmed about his demand for the right to confront the witness on this issue." Here the parties clearly intend to contest the contents of the Report, and *Harris* thus does not support admission of the Report.

**4.** Many aspects of the procedures employed by the task force cast doubt on its trustworthiness. First, the members relied on informal sources of evidence available only to them.

ence of interested parties on the consulting staff. Several of the consultants referred to earlier in this opinion have been actively involved in DES-related litigation.[5] Those consultants played an active role in the proceedings of the task force. Without the presence of a representative of the pharmaceutical industry, the Report is not the sort of neutral *fact-finding* investigation conducted by a governmental agency that is contemplated by Rule 803(8)(C).

### Conclusion

Wetherill's motion in limine seeks an order determining that the Report as such (without the safeguards that inhere in the ability to cross-examine) constitutes admissible evidence. Because it does not come within the exceptions of Fed.R.Evid. 803(8), the Report is inadmissible hearsay. Wetherill's motion is therefore denied.

Second, the task force used data generated by informal polls to DES-exposed persons, including a poll of 30 gynecologists conducted by Ms. Wetherill. Third, the task force considered substantial unpublished material, much of which was not made a part of the public record. Fourth, the task force considered evidence given by many admitted non-experts.

5. Phyllis Wetherill, in addition to being the mother of the plaintiff in this action, has filed her own action based on her ingestion of DES.

Dr. Wolfe's health research group is part of the group of Ralph Nader organizations. Public Citizen Litigation Group, the litigation arm of the Nader organization, represents several DES mothers in other actions. Barbara Seaman attempted to testify on behalf of a plaintiff in a New York action against Eli Lilly & Company based on DES, but was held by the Court to be unqualified as an expert by training, experience or background.