**Allen ANDERSON, Plaintiff,**

**v.**

**CITY OF NEW YORK, et al.,**
**Defendants.**

**No. 84 CIV. 3214 (PKL).**

United States District Court,
S.D. New York.

April 24, 1987.

Stevens, Hinds & White P.C., New York City (Richard J. Harvey, of counsel), for plaintiff.

Peter L. Zimroth, Corp. Counsel, New York City (Charlotte Biblow, of counsel), for defendants.

LEISURE, District Judge:

This case arises out of an incident which occurred during the 1982 strike of the Center for Problems of Living (the "Center") by employees who were members of Union Local 1199. Plaintiff Allen Anderson, a nurse clinician at the Center, was arrested by officers of the New York Police Department (the "NYPD") and charged with several criminal violations, which were subsequently dropped. Anderson brings this action pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1988 for alleged deprivations of his civil rights secured by the First, Fourth, Fifth, Eighth, and 14th Amendment to the United States Constitution, and for pendent state claims. Specifically, plaintiff, a black male, claims that the physical violence, allegedly accompanying his arrest, as well as the arrest and prosecution itself, were manifestations of a policy of civil rights deprivations against racial minorities and those in minority neighborhoods. Plaintiff claims that the alleged policy was promulgated, implemented and enforced by the defendants: the officers involved in the arrest, other officers, superior officers, the former and current Police Commissioner, the Mayor of New York, the members of the Civilian Complaint Review Board (the "CCRB"), and the City of New York (the "City").[1]

1. The complete list of defendants includes: the City; Mayor Edward I Koch, individually and in his official capacity; former Police Commissioner Robert McGuire, individually and in his official capacity; Police Commissioner Benjamin Ward, in his official capacity; NYPD Ad-

The action is now before the Court on a motion for summary judgment and dismissal, advanced on behalf of all defendants, with the exception of the arresting officer, Officer Appel. For the reasons set forth below, defendants' motion is granted with regard to all defendants, except those actually present at the scene of the incident.

## FACTUAL BACKGROUND

The following facts are developed from the virtually identical Local Rule 3(g) statements submitted by the parties to this motion. Plaintiff—a black male—was a nurse clinician at the Center. In or around September, 1982, employees of the Center, including plaintiff, went on strike; the work stoppage lasted several months. NYPD officers were assigned to strike detail to oversee the pickets. Prior to the incident of October 13, 1982, which forms the basis of this action, there were no arrests of strikers or violent incidents at the Center, within the time frame involved herein.

At approximately 5:30 p.m. on October 13, 1982, plaintiff was arrested by Officer Appel, who was assisted by Officer Miller and others. Plaintiff had never been arrested before. During the arrest, plaintiff sustained injuries which caused him to be transported from the 30th Precinct to Columbia Presbyterian Hospital, where he was treated and released back into police custody. Plaintiff was charged with Assault in the Second Degree, Riot in the First Degree, Resisting Arrest and Reckless Endangerment in the Second Degree. He was later released on bond. On February 10, 1983 all criminal charges against plaintiff were dropped.

A complaint was filed with the CCRB on behalf of Anderson, alleging police misconduct during the arrest. Although plaintiff was contacted by CCRB representatives twice, he declined to speak with CCRB investigators pending the conclusion of the criminal case against him. The CCRB investigation was closed, due to lack of victim cooperation, prior to the dismissal of charges, and was never reopened. No complaint was brought with the Internal Affairs Division of the NYPD.

The major area of disagreement between the parties concerns the actual events surrounding the arrest, which are not clearly described or substantively supported by either side; accordingly, these facts must be pieced together from the incomplete deposition transcripts submitted by the parties. Defendants allege that plaintiff was engaged in violent behavior directed against those crossing the picket line, Affidavit of Charlotte Biblow, Esq., sworn to on March 30, 1986 ("Biblow Aff."), Exhibit F, attached thereto, at 7; that plaintiff struck Officer Appel when the officer asked him to stop, and that plaintiff resisted arrest. Affidavit of Richard J. Harvey, Esq., sworn to on March 30, 1986 ("Harvey Aff."), Exhibit A, attached thereto, at 1. Defendants describe an arrest scene with outnumbered police officers and a mob of angry strikers hurling insults, obscenities and other more substantial objects. *Id.*

Plaintiff, on the other hand, alleges that he and other strikers were simply maintaining a presence at the strike site, *id.* Ex. B. at 1; Biblow Aff. Ex. F. at 2, when Officer Appel, unprovoked, pushed plaintiff, Biblow Aff. Ex. F. at 12, and threw him to the ground. Harvey Aff. Ex. A. at 1. Plaintiff claims Appel, Miller and other officers, then kicked and beat him while he was lying on the ground, *id.* at 3–4; Biblow Aff. Ex. G. at 2, arresting him. Plaintiff further claims that Sergeant Gunther and Detective Lewis either participated directly in the incident or had immediate command or supervision of the officers involved.

ministrators "J", "K", "L", "M", and "N" "Doe", individually and in their official capacities; NYPD CCRB Chairperson Pamela D. Delaney, members Nelson Almonte, Dr. Howard Harris, Philip McGuire, Eugene C. Masci, William E. Perry, Brenda Ross, and Assistant Commissioner/Executive Director Charles J. Adams, individually and in their official capacities; NYPD Captains "E" and "F" "Doe"; NYPD Lieutenant "G" "Doe"; NYPD Officers Appel # 4787, Miller # 27439, Sergeant Gunther # 65, Detective Lewis # 3340; NYPD Officers "A", "B", "C" and "D" "Doe" attached to 30th Precinct; NYPD Officers "S", "T", "U", "V", "W", "X", "Y" and "Z" attached to Neighborhood Stabilization Unit No. 5; New York City Internal Affairs Division Officers "O", "P", "Q" and "R" "DOE".

## LEGAL DISCUSSION

### A. *Plaintiff's Four Theories of Liability*

Plaintiff's action is predicated upon four theories of liability, each relevant as to one or more of the defendants.[2] Plaintiff first argues that this incident is not merely an isolated act by an individual police officer, or group of police officers, but rather is reflective of a general policy of racially motivated discrimination, hostility, and violence on the part of the City and the other defendants. P. Memo. at 4. Second, plaintiff claims that the incident resulted from inadequate training of the officers involved. Plaintiff's third theory of liability is that his arrest and injury resulted from inadequate and ineffective supervision of the officers involved in the arrest. P. Memo. at 6. Finally, plaintiff asserts that failure to discipline the officers, and others who commit such acts, indicates that a discriminatory policy exists and that this policy caused the behavior which violated plaintiff's civil rights. P. Memo. at 7.

### 1. *General City Policy of Racially Motivated Discrimination, Hostility and Violence*

■ To hold a municipality liable under plaintiff's first theory, plaintiff must prove the municipality caused, in some meaningful sense, the harm suffered. Generally, this requires that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated...." *Monnel, supra,* 436 U.S. at 690, 98 S.Ct. at 2035; *Oliveri v. Thompson,* 803 F.2d 1265, 1279 (2d Cir. 1986); *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34, 38 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986); *Dunton v. County of Suffolk,* 729 F.2d 903, 907 (2d Cir.1984). Furthermore, there must be a "causal link between an official policy or custom and the plaintiff's injury...." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983); *Martin v. City of New York,* 627

F.Supp. 892, 895 (E.D.N.Y.1985); *Augustyniak v. Koch,* 588 F.Supp. 793, 798 (S.D. N.Y.), *aff'd* 794 F.2d 676 (2d Cir.1984); *see also Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). This same reasoning applies to supervisory personnel. "The plaintiff must show either that the official was personally involved in the unlawful actions or that there is some causal connection between an act of the official and the alleged violation." *McQurter v. City of Atlanta, Ga.,* 572 F.Supp. 1401, 1415 (N.D.Ga.1983), *app. dismissed,* 724 F.2d 881 (11th Cir.1984) (citations omitted); *Carter v. Harrison,* 612 F.Supp. 749, 758–59 (E.D.N.Y.1985).

■ Plaintiff cannot infer a policy from the alleged violation of his own civil rights. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–4, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Martin, supra,* 627 F.Supp. at 896–97; *Loza v. Lynch,* 625 F.Supp. 850, 853 (D.Conn.1986).

### 2. *Inadequate Training and Supervision*

■ The law governing plaintiff's second and third theories—his assertions of inadequate training and supervision on the part of the police officers—is similar to that governing his first theory of liability. Once again, a single incident alone does not prove the inadequacy of training and supervision and, again, proof of such a claim does not give rise to liability. *Tuttle, supra,* 471 U.S. at 823, 105 S.Ct. at 2436; *see Martin, supra,* 627 F.Supp. at 896–97; *Loza, supra,* 625 F.Supp. at 853.

Early cases in this area of the law permitted a finding of liability based upon the idea that "a single, unusually brutal or egregious beating administered by a group

**2.** Plaintiff concedes that defendants cannot be held liable under merely a *respondeat superior* theory. Plaintiff's Memorandum of Law ("P. Memo.") at 4; *see Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692–4, 98 S.Ct.

2018, 2036–37, 56 L.Ed.2d 611 (1978) ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.")

of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge." *Turpin v. Mailet* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) (citations omitted). More recently, however, the Supreme Court held that a single incident—even one involving excessive force—could not prove the existence of a policy of insufficient training. *Tuttle, supra,* 471 U.S. at 823, 105 S.Ct. at 2436. To follow the early cases would undermine *Monell* and impose liability on what amounts to a *respondeat superior* theory. Therefore, the Supreme Court reaffirmed the prerequisite of finding a policy before extending the liability of municipalities. *Tuttle, supra,* 471 U.S. at 823, 105 S.Ct. at 2436. Moreover, *Tuttle* states that, in order to hold a municipality liable, the policy must not only exist, but it must either (1) be unconstitutional, in and of itself, or (2) be "affirmative[ly] link[ed]" with the unconstitutional acts underlying the dispute. *Id.*

Again, as with the previously described theories of liability, something more than a single incident is needed to prove that training was inadequate. In *Sager v. City of Woodland Park,* 543 F.Supp. 282, 297–98 (D.Col.1982), the Court was provided with evidence that indicated that, not only were training procedures in a film outlining apprehension techniques incorrect, but that this was known by city officials, who, nevertheless, continued to use the film. The technique in question was used by the defendant police officer in *Sager* and resulted in the fatal shooting of a suspect. Similarly, in *McQurter, supra,* 572 F.Supp. 1420–21, lack of training regarding the use of a lethal restraint technique—a choke hold—was shown to have been a factor in the death of a suspect.

■ Something more than a single incident is also needed to hold the municipality and its officials liable for lack of supervision of police officers. Under *Turpin,* "absent more evidence of supervisory indifference, such as acquiescence in a prior *pattern* of conduct, a policy could not ordinari-

ly be inferred from a single incident of illegality such as ... excessive use of force." 619 F.2d at 202 (emphasis added) (citations omitted); *see also Tuttle, supra,* 471 U.S. at 821, 105 S.Ct. at 2435; *Cattan v. City of New York,* 523 F.Supp. 598, 600–01 (S.D.N.Y.1981).

Supervisory personnel have been found liable, based on a single violative incident, if they are present during the incident and fail to stop behavior violative of constitutional rights. Such failure to supervise, if so "grossly negligent" that it can be termed "deliberate indifference," can be of constitutional magnitude. *Owen v. Haas,* 601 F.2d 1242, 1247 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Cattan, supra,* 523 F.Supp. at 600–01. While this duty to supervise is most clearly attributable to supervisory personnel, it falls upon any officer witnessing unconstitutional behavior. *McQurter,* 572 F.Supp. at 1415.

### 3. *Failure to Discipline*

■ The analysis of plaintiff's fourth theory of liability, for failure to discipline, is consistent with those already discussed. Under this fourth theory, consistent failure to discipline gives rise to a finding of an "implicit policy." *Turpin, supra,* 619 F.2d at 200–01. Thus, if "senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the muncipality may be held liable for a subsequent violation...." *Id.,* at 201. This complacency in the face of repeated violations amounts to "tacit authorization" of the offensive acts. *Id.; Loza, supra,* 625 F.Supp. at 854. The Second Circuit recently reaffirmed this principle by holding that "municipal inaction such as persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell.*" *Bastista, supra,* 702 F.2d at 397 (citations omitted). Plaintiff, however, must link the behavior in question to the policy of failure to discipline—for example, the officer must have known of the policy

at the time he allegedly committed the civil rights violations.

■ At the same time, it is not improper to fail to punish an officer for a single incident of illegal behavior. *Turpin, supra,* 619 F.2d at 202–03. In *Turpin,* the Second Circuit refused to find an implied policy of failure to discipline where the officer involved in the alleged civil rights violation was promoted rather than disciplined shortly after he was found liable for violating § 1983. The Second Circuit indicated that there are many reasons for not disciplining or even promoting an officer after a single incident, and that only after a pattern of such failures to discipline evolved could a municipal policy be imferred. *Id.* at 203; *see also McQurter, supra,* 572 F.Supp. at 1419. Similarly, a superior officer can only be liable for acts of subordinates "if he persistently fails to discipline subordinates in the face of knowledge of their propensity for improper use of force." *McQurter, supra,* 572 F.Supp. at 1419 (citation omitted).

Mindful of the foregoing standards of substantive law, the Court must now apply them within the framework of the facts of the instant case. The Court notes, however, that at this juncture, the question before the Court is not whether plaintiff has provided enough evidence to establish his civil rights claims. The Court only faces the question whether defendants have satisfied their burden so as to be entitled to summary judgment.

B. *The Standard for Summary Judgment*

The standard for summary judgment is outlined in Fed.R.Civ.P. 56(c). Pursuant to Rule 56(c), summary judgment shall be rendered if the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir.1985); *R.G. Group Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues

to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985)).

In order to grant summary judgment, a "court must also determine that any unresolved issues are not material to the outcome of the litigation." *Knight, supra,* 804 F.2d at 11. "[T]he mere existence of factual issues—where those issues are not material to the claims before the court— will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

As the Supreme Court has noted, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1) (citation omitted). The Supreme Court has recently provided guidance in applying the standard for granting a motion for summary judgment. *See Celotex, supra,* 106 S.Ct. 2548; *Anderson, supra,* 106 S.Ct. 2505; *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In *Celotex,* the Court, reversing the decision of the District Court of Columbia Circuit, held that:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concern-

ing an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

106 S.Ct. at 2552–53.

In *Anderson*, the Court, in considering the question of whether the clear and convincing evidence requirement under libel law must be considered by a court ruling on a motion for summary judgment, noted that "the substantive law will identify which facts are material" for the purposes of summary judgment. 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).

> The Court also held in *Anderson* that: [S]ummary judgment will not lie if the dispute about a fact is "genuine" that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Id.* In addition, the Court noted that there "is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may not be granted." *Id.* at 2511 (citations omitted). Therefore, the standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.*

Moreover, under Rule 56(e), this Court, in deciding a motion for summary judgment, may only consider "facts as would be admissible in evidence." Fed.R.Civ.P.

56(e); *see, e.g., Brokers' Assistant v. Williams Real Estate Co.,* 646 F.Supp. 1110, 1118 n. 32 (S.D.N.Y.1986). Mindful of the foregoing procedural principles, the Court now turns to the factual bases of plaintiff's claim, in the context of the substantive law of municipal liability.

C. *The Admissible Evidence Presented by Plaintiff is Insufficient to Defeat Defendants' Summary Judgment Motion*

1. *The Congressional Report*

Plaintiff bases his allegations regarding the existence of a municipal policy—the linchpin to most of his claims against the majority of the defendants—upon the *Report on Hearings in New York City on Police Misconduct by the Subcommittee on Criminal Justice (the "Subcommittee") of the Committee on the Judiciary of the United States House of Representatives, Ninety-Eight Congress, Second Session* (1984) (the "Report"). Harvey Aff. Ex. B. The Report is based on two open session hearings held by the Subcommittee on NYPD misconduct. During the two sessions—one held in September, 1983, and the other in November, 1983—members of the Subcommittee heard testimony from: persons alleging police misconduct; officers alleging misconduct by fellow officers; Mayor Edward Koch; Police Commissioner Robert McGuire; and a report of the Police Benevolence Fund. *Id.* at 3–4. The Report, summarizing these hearings, is an indictment of a system seen as encouraging—through failures of supervision, training and discipline—a pattern of illegal arrest, harassment, foul language and racial slurs, and brutality, aimed at minorities by white police officers. Therefore, the Report certainly lends support to plaintiff's allegation that there exists an implicit, but wellknown, policy condoning, if not encouraging, such behavior.[3] Because the single arrest of plaintiff cannot, in and of itself, establish any of plaintiff's claims, except those against the officers involved *directly*

---

**3.** While plaintiff also relies marginally on a report by the CCRB (with respect to the failure to discipline theory) and the depositions of the officers involved (with respect to the lack of training theory), plaintiff's four arguments primarily hinge on the facts surrounding his own arrest and on the Report.

in his arrest, plaintiff's case against the rest of the defendants turns on the Report.

Although, it is clear that the Report supports plaintiff's position, it is unclear whether the Report—undoubtedly hearsay [4]—is admissible to prove plaintiff's allegation that such a discriminatory policy exists.[5] The only exception to the hearsay rule which might be applicable to the instant Report is that involving "public records and reports." This exception includes:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8).

The "public records and reports" exception, like the other exceptions to the hearsay rule, is found in the common law and the Federal Rules of Evidence "is premised ... on the principles of necessity and trustworthiness." Weinstein and Berger, *Weinstein's Evidence,* ¶ 803(8)[01], p. 233 (citing *Wong Wing Foo v. McGrath,* 196 F.2d 120, 123 (9th Cir.1952); *Vanadium Corp. v. Fidelity & Deposit Co.,* 159 F.2d 105, 109 (2d Cir.1947)). More specifically, this "exception is recognized because of necessity or the inconvenience which would result from always requiring the testimony of the official in person to the facts he has recorded; and his official duty supports the re-

quirement that there be found some circumstantial probability of trustworthiness." *Vanadium Corp., supra,* 159 F.2d at 109. For these strong policy reasons, the records of public officials are admissible in court despite their status as hearsay.

Rule 803(8) recognizes three categories of public records which satisfies the exception: "A) records of the office's or agency's own activities, B) records of 'matters observed pursuant to duty imposed by law' and, C) evaluative reports." *Weinstein's Evidence, supra,* 803(8)[01], p. 235. The instant Report could be included solely under the last of these three exceptions.[6]

■ "Rule 803(8)(C) applies only to investigative reports based on 'factual findings.'" *Wetherill v. University of Chicago,* 518 F.Supp. 1387, 1390 (N.D.Ill.1981). "'Factual findings' as used in Rule 803(8)(C) has been and should be given an expansive reading." *Id.* (citation omitted). Moreover, even if the instant Report should meet this requirement of Rule 803(8)(C), the Report's contents may still be inadmissible if the sources of information or other circumstances surrounding the Report indicate a lack of trustworthiness or reliability. Factors to consider in deciding whether to admit the evaluative findings of the Report under Rule 803(8)(C) are "the timeliness of the investigation, [the special skill or experience of the reporter,] whether a hearing was held in conjunction with [the investigation], and the motivation of the officials conducting the investigation." *Weinstein's Evidence, supra,* at ¶ 803(8)[03] at p. 254 (footnote omitted). Applying the aforementioned factors to the instant Report the Court can only conclude that the Report is unreliable and therefore, inadmissible hearsay.

The first factor—the timeliness of the Report—is not a problem for the Report, at

---

**4.** Federal Rule of Evidence 801(c) defines "Hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

**5.** The Court notes that despite the obvious importance of the legal question of admissibility, neither side has provided any discussion of the law in this area.

**6.** The Report concerns the activities of the NYPD and therefore does not "set forth (A) the activities of the [Subcommittee itself]...." Moreover, the Report considers "(B) matters observed" by certain individuals who were *not* under a "duty imposed by law" to report such matters (for example, alleged victims of police brutality.)

least in one limited respect; the hearings, upon which the Report is based, took place in 1983 and covered the period from 1979 through 1983. The arrest underlying this action occurred in 1982, during the period of time covered in the hearings and reports. However, this fact does not really address the use of the concept of "timeliness." The Subcommittee did not investigate or examine, in a timely manner, reports regarding the instant set of facts and how, if at all, they are related to the alleged general policy of discrimination. Accordingly, on balance, it is unclear whether the element of timeliness cuts for or against the admissibility of the Report.

In the context of a report of a Congressional Subcommittee or a Committee Report, the second element of trustworthiness and reliability—the special skill or experience of the reporter—is also problematic. Investigations by these committees are commonplace and members of such committees develop, over years of participation, expertise in the committee's policy area. Whether this provides committee members with any special expertise in evaluating witnesses, especially regarding their credibility or accuracy of recall, is questionable. The reliability of such a committee's judgment is even more tenuous where, as here, the Subcommittee members lacked personal or actual knowledge of the events about which testimony was being taken and heard, primarily, only one side of the story. Similarly, while Congressional hearings are so termed, they do not fit closely the judicial meaning of hearings, at least in comparison to the hearings held by administrative agencies in their quasi-judicial capacity.

Finally, the motivation underlying the generation of the instant Report, in and of itself, outweighs the previously discussed factors, at least for the purposes of this action. Obviously the "witnesses" at these hearings were self-interested in their testimony. While the Court respects efforts at legislative fact-finding, nevertheless, it cannot be denied that hearings and subsequent reports are frequently marred by political expediency and grandstanding. As the District Court for the Western District of North Carolina noted:

[C]ongressional committee hearings are oft time conducted in a circus atmosphere, with a gracious plenty of posturing by the politicians for T.V. publicity in large part for benefit of constituents back home....

This "circus" is hardly conducive to the development of facts, but more to entertainment of the the television audience. The Court does not look to the reports of such activities as productive of any facts which would persuade the Court one way or the other.

*Knight Pub. Co. v. U.S. Dept. of Justice,* 631 F.Supp. 1175, 1178 (W.D.N.C.1986) (declining to consider as "facts," to illustrate and support allegations of bad faith in a law enforcement investigation, statements and opinions included in a *Report of the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary House of Representatives together with Dissenting Views Ninety Eight Congress Second Session*). The Report offered as evidence in this action suffers from the same apparent motivational flaws as discussed by the District Court of the Western District of North Carolina.

In sum, because the Report is the result of hearings which lack procedural due process protections, because the Report articulates findings based upon a dubious, highly charged process of essentially "interviewing" interested parties, and because of the serious policy implications [7] of admitting the Report in evidence, this Report has no place as evidence in the instant action. The Report lacks the ordinary indicias of reliability, is not based on the personal

---

**7.** In particular, if plaintiffs were allowed to use this Report to prove the existence of a municipal policy of discrimination in law enforcement, or even the presence of other incidents besides the one alleged in the action, New York City and its public officials would clearly be unable to obtain summary judgment in *any* civil rights action alleging police misconduct. The Report, in and of itself, would provide a *prima facie* case against the City, regardless of the facts of the particular case under consideration. The burden of proof would therefore be shifted from the plaintiff to the defendant. If this shift in the burden of proof is the will of the legislature, it should be enacted by Congress, not through the mere hearings of a subcommittee.

knowledge of the reporter, and contains the testimony of interested parties, not experts. This Court, therefore, rules it inadmissible and will not consider it in deciding the instant motion for summary judgment.

### 2. Plaintiff's Remaining Factual Claims

■ Aside from the aforementioned Report, plaintiff has not made any, but the most conclusory allegations that there is a City policy of encouraging civil rights violations. As the Court described more fully above, more than a single incident, even one far more violent and injurous—even fatal—than the one underlying the instant action, is necessary to demonstrate the existence of such a policy. Except for the Report, which is not admissible evidence, plaintiff makes no attempt to provide any specific, substantive allegations regarding the existence of a policy of civil rights violations in the City.[8] Therefore, this Court grants summary judgment with regard to plaintiff's first theory of liability. The same is true of plaintiff's factual allegations regarding the failure to train, supervise, and discipline theories of liability. However, the Court will treat each of these claims separately because plaintiff makes additional allegations with respect to each of them.

### a. Failure to Train

■ Plaintiff alleges that the failure to train the defendant officers specifically for "strike duty" demonstrates a failure of training. Plaintiff, however, fails to establish why such training is inherently necessary. Plaintiff fails to demonstrate how the patrol of a strike area and the arrest of strikers is significantly different from the patrol of other areas and the arrest of other individuals. Such a failure on the part of plaintiff is particularly noteworthy in light of the non-violent history of the strike which provided the backdrop for the instant dispute.

The strike in this case commenced in September, 1982; plaintiff was arrested on October 13, 1982. Prior to the time of plaintiff's arrest, there had been no arrests or trouble at the strike site. Perhaps if the the strike location had been plagued by prior violent confrontation, dispatching rookies—who lacked special training—to handle such violence would indicate a failure of training sufficient to establish a constitutional violation. But that is not the situation now before the Court.[9] Summary judgment is therefore granted with regard to this theory of liability.

### b. Failure to Supervise

■ A pattern of failure to supervise is necessary to hold the municipality liable. Again plaintiff has failed to provide sufficient facts to establish the pattern element of this theory of liability. Similarly, since an individual not present at the scene of the incident cannot be held individually liable for failure to supervise, all defendants in the instant action, not present at the scene, cannot be liable for failure to supervise. Therefore, the Court grants defendants' motion for summary judgment with respect to defendants not present at the scene of the accident.

■ The courts have found liability, however, for the failure of supervisory per-

---

8. Instead of producing admissible evidence to rebut defendants' motion for summary judgment, plaintiff promises the Court that, presumably at time of trial, he will "present the testimony of competent expert witnesses to the effect that, at the precise time of the events herein complained of, there existed a custom and policy whereby the above-named Defendants treated 'less than seriously' allegations of police misconduct and further that racism was 'a major factor in alleged police misconduct specifically and in police-community relations generally.'" P. Memo. at 4–5 (quoting the Report at 21). However, plaintiff's decision to not produce this purported evidence at this juncture is fatal to plaintiff's claim. As the Second Circuit noted in *Donnelly v. Guion*, 467 F.2d 290 (2d Cir.1972),

"[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until trial for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried." 467 F.2d at 293.

9. The Court also notes that a claim for failure to train is most commonly raised in the context of the use of specific techniques, not general types of duty. *See McQurter, supra,* 572 F.Supp. at 1420; *Sager, supra,* 543 F.Supp. at 297–98. Plaintiff does not here allege that there was a failure to train the defendant police officers in the particular techniques they used during the arrest of plaintiff.

sonnel, and other officers present at the scene, to intercede. This liability has been limited to cases where the witnessed behavior was so violative of civil rights that such failure to act in order to stop this behavior, itself, demonstrated a "deliberate indifference" to the rights of the plaintiff on the part of the witnessing officers. Since the extent to which plaintiff's rights were actually violated, at the time of his arrest, involves a set of material facts still in issue, summary judgment with respect to the claims against defendants present at the scene of the arrest is not appropriate and is hereby denied.

### c. *Failure to Discipline*

██ Finally, plaintiff bases his claim upon the failure to discipline the officers involved in the incident. As the Court described previously, however, failure to discipline an officer or officers for a single alleged incident does not establish a policy of failing to discipline. Plaintiff presents documents from the CCRB in support of his allegation that there existed a pattern of failure to discipline. In particular, these documents indicate that Officer Appel has been the subject of five complaints. However, the Court notes that plaintiff's complaint is the first of the five. Moreover,

even if plaintiff proved that these complaints lodged with the CCRB, and their dismissal for a variety of reasons, indicated a policy of failure to discipline, such evidence could not be used to prove the existence of such a policy *before* the alleged behavior pattern began, much less that Officer Appel knew of this policy and relied upon it in his alleged violation of the rights of plaintiff. Therefore, the Court hereby grants defendants' motion for summary judgment with respect to plaintiff's claim of failure to discipline.

### CONCLUSION

For the aforementioned reasons, summary judgment is granted for, and the complaint is dismissed against, all defendants, except the officers actually involved in, or present during, the arrest and alleged beating of plaintiff. Counsel for plaintiff and the remaining defendants are directed to contact the Court for the purposes of scheduling a conference to discuss any remaining pretrial matters.

SO ORDERED.