Franklin DEJESUS, Eugenio Dejesus, Freddy Pirrental, Rafael Ortiz and Otilio Pena Plaintiffs,

v.

VILLAGE OF PELHAM MANOR, and John T. Pierpont, individually and as an employee of the Village of Pelham Manor, Defendants.

No. 02 CIV. 2381.

United States District Court, S.D. New York.

Sept. 17, 2003.

David Zelman, Law Office of David Zelman, New York, NY, for Franklin Dejesus,

Eugenio Dejesus, Freddy Pirrental, Rafael Ortiz, Otilio Pena, plaintiffs.

John F. McKay, III, Suite 1E11, Lake Success, NY, for the Village of Pelham Manor, John T. Pierpont, Individually and as an employee of the Village of Pelham Manor, defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Franklin Dejesus, Eugenio Dejesus, Freddy Pirrental ("Pirrental"), Rafael Ortiz ("Ortiz") and Otilio Pena ("Pena") (collectively, "Plaintiffs") filed a complaint, dated March 27, 2002 (the "Complaint" or "Compl."), alleging five causes of action, pursuant to 42 U.S.C. § 1983, for violations of their rights under the United States Constitution. Defendants Village of Pelham Manor ("Pelham Manor") and John Pierpont ("Pierpont") (collectively, "Defendants") now move for summary judgment pursuant to Fed. R.Civ.P. 56, in whole or in part, dismissing the claims against them. For the reasons set forth below, Defendants motion is DENIED in part and GRANTED in part.

## I. BACKGROUND [1]

Pierpont has been the Village Manager of Pelham Manor since 1995. The Village Building Code of Pelham Manor, enacted on January 23, 1995 ("Building Code"), charges Pierpont with, among other duties and responsibilities, the issuance of building permits for Pelham Manor and the authority to investigate potential violations, and to enforce all regulations concerning building and housing construction and repair. (See Building Code, attached as Exh. D to Exhibits to Notice of Motion for Summary Judgment ("Exhibit Bind-

er")). In order to enable him to fulfill these duties, the Building Code empowers Pierpont with the "right of entry" to any building or structure at "any reasonable hour." Id. Pierpont testified that he was uncertain as to whether he had the power to arrest and nothing in the Building Code expressly grants him the authority to arrest or detain.

On February 21, 2002, the date of the incident out of which this action arises, Plaintiffs were engaged in construction work at the residential premises located at 50 Shore Road, Pelham Manor (the "Premises") on behalf of MSC Restoration Inc. The Premises are owned by Marie Cullen and her husband William Cullen, who also own and operate MSC Restoration Inc. It is not contested by Plaintiffs that on this date they were working at the Premises without a proper work permit.

After observing two construction vans parked outside, Pierpont entered the Premises. Pierpont asked Franklin Dejesus about the work being performed at the Premises and whether a work permit had been obtained. Pierpont identified himself as the Village Manager of Pelham Manor by flashing his official badge. Plaintiffs allege that when they did not produce the requested work permit, Pierpont started ordering them around and indicated that they were under arrest. According to Plaintiffs, Pierpont demanded that Franklin Dejesus order all the workers to congregate downstairs, refused to allow Franklin Dejesus to call his employer, ordered all the Plaintiffs to stay in the hallway while he searched the premises, and ordered that the car keys to both vans be given to him. Pierpont was also observed

1. The factual summary that follows derives primarily from Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1 Stmt."), dated May 19, 2003, and Defendants' Rule 56.1 Statement in Support of Motion for Summary Judgment ("Def. 56.1 Stmt."), dated April 15, 2003. Except where specifically referenced, no further citation to these sources will be made.

searching one of the Plaintiffs' vans internally and the other through the vehicle's window. Ultimately, Pierpont indicated that he would return within thirty minutes and that Plaintiffs should leave the Premises before he returned, otherwise he threatened that they would be arrested. Plaintiffs allege that although the keys to the vans were not returned to them by Pierpont, they had spare keys that they used to depart from the Premises soon after Pierpont left. Pierpont returned to the Premises shortly thereafter, at which point the Plaintiffs had already departed, and issued a stop work order, which was posted on the front door of the Premises.

Based on these allegations, Plaintiffs assert that Defendants violated their Fourth and Fourteenth Amendment right to be free from an unreasonable search and seizure, both as to their persons and their property, as well as a deprivation of their property without cause in violation of their Fifth Amendment right to due process. Plaintiffs attest to psychological damage and limited economic damage from missed days of work as a result of these alleged violations. Defendants counter that no unlawful seizure of Plaintiffs took place, that Pierpont is entitled to qualified immunity for his actions, that Plaintiffs had no expectation of privacy in the allegedly searched property and that Pelham Manor is not liable for the actions of Pierpont under the legal parameters of § 1983.[2] Moreover, Defendants allege that, based on the current record, Plaintiffs are only entitled to nominal damages, and therefore should be precluded from any additional recovery as a matter of law.

## II. DISCUSSION

### A. STANDARD OF REVIEW

To grant summary judgment, the court must determine that no genuine issue of

---

**2.** Plaintiffs also contend that Defendants' motion for summary judgment should be denied because of their failure to comply with Local Civil Rule 56.1 with regard to submitting a "concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried" wherein "each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible...." The Court recognizes the first four pages of Defendants' 56.1 Statement as satisfying this requirement. This is the only portion of Defendants' 56.1 Statement and Attorney's Declaration and Affirmation, which are grouped together as one twenty-three page document, that has appropriate cites and states solely issues of fact, without conclusions of law and argumentation. The Court, therefore, will not dismiss the motion on these grounds.

However, the Court notes that Defendants' submissions are in direct violation of the Court's Individual Practices, which specify a twenty-five page limit on all memoranda of law submitted in support of motions, and the Court's Order of April 15, 2003 (the "Order"). In that Order, the Court denied Defendants' request to extend the page limitations on the parties memoranda of law in support of and in opposition to Defendants' summary judgment motion, and instead suggested that, in order to reserve more room for argumentation, the parties' factual recitations be confined to an appropriate 56.1 statement of material facts in dispute. The Order was not intended to give Defendants leave to include legal and factual argumentation in their 56.1 Statement and/or in a separate attorney affirmation. Instead, Defendants have essentially submitted two memoranda of law in support of their motion, one consisting of factual argumentation, with legal citations (pages 5–23 of Defendants' 56. 1 Statement), and a purely legal analysis, which does not apply the law to the facts, in a separate twenty-page memorandum of law attached to the Notice of Motion, dated April 15, 2003. The twenty-page legal treatise and separate eighteen pages of factual argumentation submitted by Defendants not only violates this Court's twenty-five page limit for memoranda of law but, in not immediately applying the law to the facts relevant in this case, also contravene elementary principles of effective legal analysis and motion practice.

material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.*, 477 U.S. at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See United States v. One Tintoretto Painting Entitled* *"The Holy Family With Saint Catherine and Honored Donor"*, 691 F.2d 603, 606 (2d Cir.1982) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

## B. UNLAWFUL DETENTION OR ARREST

Plaintiffs argue that Pierpont arrested them without a warrant or probable cause that they had committed a crime, thereby violating their Fourth Amendment right to be free from an unreasonable search and seizure. Moreover, Plaintiffs more broadly assert as part of the Complaint that Pierpont's actions constituted an unreasonable seizure of their persons, even if not rising to the level of an arrest. In response, Defendants contend that no arrest occurred and that, if any minimal detention did occur, Pierpont acted properly within the scope of his authority.

The Fourth Amendment of the United States Constitution proscribes "unreasonable seizures." A seizure of a person is said to have occurred "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1845–46, 155 L.Ed.2d 814 (2003) ("A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'") (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) and *Michigan v. Chesternut*,

486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)).

An arrest is the "quintessential 'seizure of the person.'" *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). However, the Fourth Amendment also protects against more limited detentions: "when an officer 'even briefly detains an individual and restrains that person's right to walk away,' he has effected a seizure and the limitations of the Fourth Amendment become applicable." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991) (quoting *United States v. Moreno*, 897 F.2d 26, 30 (2d Cir.1990)); *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (the protection against unreasonable search and seizures extends to "seizures that involve only a brief detention short of traditional arrest.")

The Supreme Court has delineated two categories of seizures of the person implicating the protection of the Fourth Amendment. *See id.* The first is an investigative detention or "Terry Stop" in which state actors, usually police, employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time" and is justified by reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A higher level detention constituting an arrest occurs "[i]f the totality of the circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, ... and the government must establish that the arrest is supported by probable cause.'" *Posr*, 944 F.2d at 98 (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir.1989)). Either an arrest or an investigative detention is actionable under § 1983 provided that the state official acted without authority or without the requisite suspicion or probable cause, in other words, when a state official acts unreasonably. *Id.* The distinction between an arrest and a seizure is a matter of degree and a question of fact to be determined by the fact-finder and not as a matter of law. *Id.*

Not every encounter between a state official and a private citizen is a seizure, for instance, a village manager is entitled to ask questions of contractors who he suspects are doing unauthorized work, in particular with regard to whether they have a work permit. *See INS v. Delgado*, 466 U.S. 210, 215–216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual or ask to see an individual's identification); *United States v. Lee*, 916 F.2d 814, 819 (1990) ("Certainly, a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure."); *Royer*, 460 U.S. at 497, 103 S.Ct. 1319 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.") However, absent probable cause or reasonable suspicion, an officer must not convey that response to such perfunctory inquiries is mandatory or that failure to comply with the requests would lead to further detention. *See Bostick*, 501 U.S. at 435, 111 S.Ct. 2382; *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (absent a reasonable suspicion of misconduct, after defendant refused to identify himself, detention to determine his identity violated defendant's Fourth Amendment rights). The relevant assessment is of the "overall coercive effect of police [or state official] conduct." *Lee*, 916 F.2d at 819.

██ No formal procedure must occur for a court to determine that an arrest or seizure has taken place. *See Terry v. State of Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("the Fourth Amendment governs seizures of the person which do not eventuate in a trip to the station house and prosecution for crime—arrests in traditional terminology"). Factors that have been found relevant in determining whether a seizure has occurred include: "threatening presence of several officers; the display of a weapon; physical touching of the person of the officer; language or tone indicating that compliance with officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by an officer to accompany him to the police station or a police room." *See id.* (citing *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.)

██ Defendants do not allege that Pierpont, as the Village Manager, had the authority to make an arrest or to detain. Pierpont does have the authority to check a work permit and to issue a stop-work order if he feels that unauthorized construction is being performed within his jurisdiction; but, presumably, would have to call police in order to seize a person because of a violation of applicable local codes. In this regard, Defendants do not allege that Pierpont had probable cause to arrest or reasonable suspicion to detain the Plaintiffs. Rather, they assert that no detention of Plaintiffs occurred. In fact, Defendants argue that since Pierpont was not a police officer, and did not have the power to arrest, it was not reasonable for Plaintiffs to believe they were under arrest.[3]

Since Pierpont's power to arrest or detain has not been established by Defendants, and therefore any seizure conducted by Pierpont covered by the Fourth Amendment would be unreasonable, the central inquiry here is whether a seizure occurred—that is, whether it was reasonable for Plaintiffs to believe they were not free to leave the Premises while Pierpont was conducting his investigation into the permissibility of the construction work being performed. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. Here, the typical incidents of a formal arrest are clearly not present: the presence of police officers, physical coercion, a trip to the police station, or the reading of Plaintiffs' *Miranda* rights. However, according to Plaintiffs, Pierpont flashed a badge as a signal of his authority, ordered them around, directed them to remain on the Premises while he conducted a search, told them they were under arrest, and took away their van keys, which clearly could have conveyed an intention by Pierpont to detain Plaintiffs. If all of Plaintiffs' testimony is credited, a rational jury could find that an order to remain on the Premises and a confiscation of van keys, which allegedly were never returned, after a showing of authority by flashing an official badge, could reasonably have been understood by Plaintiffs to be a command not to leave the Premises, that compliance with Pierpont's orders was required and that failure to do so could be punishable. Accordingly, in this case, there is an issue of material fact to be decided by a jury as to whether it was

---

3. Although in a general legal manner, without applying the law presented, Defendants assert that the bar for determining reasonable suspicion to perform an investigatory detention is low, and presumably are implying that Pierpont's actions were thus justified, they do not put forward sufficient facts to establish that it was permissible for Pierpont to detain Plaintiffs in any manner whatsoever. Having the power to investigate work permits does not necessarily entail the power to confiscate car keys or, under threat of reprisal, to order Plaintiffs to appear on the first floor of the Premises.

reasonable for Plaintiffs to believe they were not free to leave the Premises, which would suffice to establish a detention protected by the Fourth Amendment.

In attempting to argue that a seizure did not occur in this case as a matter of law, Defendants make certain bald legal arguments that are simply not supported by the cases cited. It is simply not accurate that a show of force is necessary to constitute an arrest. (*See* Def. Mem. at 3; Def. 56.1 Stmt. at 9, 12.) ("Some type of show of force is necessary to constitute an arrest.") At most, the cases cited by Defendants indicate that force was sufficient to create a detention or arrest. Rather, the relevant legal inquiry is whether it is objectively reasonable for a plaintiff to believe that he was coercively detained, that "his liberty was interrupted," *People v. Fripp*, 85 A.D.2d 547, 445 N.Y.S.2d 3, 4 (App. Div. 1st Dep't 1981). This detention can be accomplished without a show of force. In fact, in *Terry*, the Supreme Court held that "[o]nly when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n. 16, 88 S.Ct. 1868 (emphasis added).

Moreover, the fact that Plaintiffs could have left the Premises, thereby eluding any alleged detention, does not preclude a rational finding that Plaintiffs reasonably felt compelled to stay, if not by the threat of physical force, then by the threat of legal action against them by the Village Manager and ultimately the police—the threat of authority. *See Kaupp*, 123 S.Ct. at 1846 (seizures can occur even when a person does not attempt to leave) (citing *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870). Plaintiffs allege that Pierpont flashed his badge, notifying the Plaintiffs to his status as an official; therefore, if credited by a jury, Pierpont's assertion of authority, compelling Plaintiffs to remain

on the Premises, could reasonably be found.

Finally, Defendants attempt to distinguish Franklin Dejesus's claim of false arrest or improper detention from the claims of the other four plaintiffs is not persuasive. First, that Pierpont communicated only with Franklin Dejesus directly and that the others simply overheard the conversation between these two principals or had the communications translated to them does not invalidate the other plaintiffs' perceptions concerning whether they were under arrest or free to leave. Eugenio Dejesus testified that Pierpont stated that they were under arrest, that they were not to go anywhere, witnessed the flashing of a badge of some sort, and the commandeering tone Pierpont exerted, including taking two of the workers' car keys. (*See* Deposition of Eugenio Dejesus ("E. Dejesus Dep."), dated November 12, 2002, attached as Exh. A2 to the Exhibit Binder, at 46–50.)

Ortiz testified that he witnessed Pierpont "flash" some form of identity as a signal of his authority and that he understood from Pierpont that he was under arrest and that Pierpont ordered them not to leave the property. (Deposition of Rafael Oritz ("Ortiz Dep."), dated November 12, 2002, attached as Exh. A3 to the Exhibit Binder, at 73–78.) Pirrental similarly indicated that Franklin Dejesus conveyed to him, and that he understood from what was said by Pierpont, that he was under arrest or otherwise detained, along with the other Plaintiffs. (Deposition of Freddy Pirrental ("Pirrental Dep."), dated December 9, 2002, attached as Exh. A4 to the Exhibit Binder, at 38–39.) In addition, Pena also testified that, although he does not speak English, Franklin Dejesus conveyed to him that all of the Plaintiffs were detained, that they were in danger of being arrested, that he witnessed Pierpont

ordering the Plaintiffs to hand over their keys, and that Pierpont flashed some identification as a signal of his authority. (*See* Deposition of Otilio Pena ("Pena Dep."), dated December 11, 2002, attached as Exh. A5 to the Exhibit Binder, at 46, 52.)

Although Defendants allege that Pena testified that he was physically free to leave the Premises and therefore could not be conscious of his confinement, in actuality, Pena testified that his "nerves" and his respect for the law made him feel that he was not free to leave. (*Id.* at 55.) As indicated above, a rational trier of fact could find that the threat of state authority and arrest, coupled with the commandeering posture taken by Pierpont and his orders to Plaintiffs to remain on the property, as well as his confiscation of their car keys and his expressions understood by some of the Plaintiffs to indicate that they were under arrest, could have made Pena, and the other Plaintiffs, feel that they were confined to the Premises, regardless of their ability to physically escape.

In sum, such testimonial evidence from Plaintiffs creates a genuine issue of material fact as to whether Eugenio Dejesus, Ortiz, Pena, and Pirrental, as well as Franklin Dejesus, reasonably felt free to leave the Premises or were impermissibly detained. Moreover, generally, because all of the Plaintiffs alleged to have witnessed a similar version of these same events from the time Pierpont ordered them down to the hallway, it is reasonable that they all would have felt similarly detained, either because of what they perceived Pierpont to have ordered or from their understandings from each other. In any event, such differing perspectives represent a matter of fact to be determined by a jury.

## C. *QUALIFIED IMMUNITY*

Defendants next argue that even if some impermissible detention is found, Pierpont is entitled to qualified immunity for his actions at the Premises on February 21, 2001.

It is well settled that qualified immunity shields police officers, and other state officials, from personal liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In other words, "if it is objectively reasonable for an official to believe that he or she is acting within constitutional and statutory bounds, the official will be insulated from liability stemming from his or her conduct." *Natale v. Town of Ridgefield,* 927 F.2d 101, 104–105 (2d Cir.1991). "Clearly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Laverne v. Corning,* 522 F.2d 1144, 1149 (2d Cir.1975) ("qualified immunity is based on the common-sense rationale that the public interest requires that public officials be able to carry out their discretionary duties and act decisively without the intimidation that would result if good-faith errors in judgment were later to subject them to liability for damages.")

██ Qualified immunity extends to all state actors, including village managers or building inspectors. *See Zahra v. Town of Southold,* 48 F.3d 674 (2d Cir.1995); *Knoeffler v. Town of Mamakating,* 87 F.Supp.2d 322 (S.D.N.Y.2000). "Summary judgment on the basis of qualified immunity is appropriate when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Ricciuti,* 124 F.3d at

127 (citing *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995)).

Here, the question of whether Pierpont acted in good faith or should have known that his actions were prohibited, entitling him to qualified immunity, is a question of fact to be determined by the jury. That the right to be free from arrest or prosecution in the absence of probable cause and the right to be free from an investigatory detention without reasonable suspicion are clearly established federal rights is beyond debate. These are basic, longstanding, deeply-rooted rights of which Pierpont should have known. In essence, because this Court finds that the nature of Pierpont's actions at the Premises is a matter of fact to be decided by the jury, *i.e.*, whether a false arrest or other impermissible detention occurred, it is as of yet undetermined what impermissible action would have to violate clearly established federal law to rebut the defense of qualified immunity. If the jury were to find that a false arrest actually occurred, the jury could also find that since the arrest was conducted by a building inspector, who possessed no such authority, Pierpont should have been aware of his lack of authority to arrest in violation of Defendants' clearly established federal rights, in particular where there is no probable cause even asserted. If the jury were to find that an impermissible detention short of an arrest occurred, the circumstances would still raise an issue of fact for the jury whether it was reasonable for Pierpont to believe he was acting within his authority. That Pierpont himself is not sure whether he had the power to have arrested or detained Plaintiffs is indicative of the factual grounding of any such finding. In sum, it is clear that if a seizure occurred and Peirpont acted without probable cause or reasonable suspicion of illegality, not to mention lack of authority to detain, it would be reasonable for a jury to find that he acted in violation of clearly established constitutional rights of which he should have been aware. *See Ricciuti*, 124 F.3d at 128.

The cases cited by Defendants are inapposite. In *Laverne*, the building inspector was deemed immune from liability for his inspection of property, which was later held to be an unconstitutional search because it was done for purposes of obtaining evidence for a criminal prosecution. 522 F.2d at 1146. The act of inspecting the property, however, was clearly allowed by the village ordinance at issue in that case. *Id.* Similarly, in *Zahra*, the clearly established right at issue was the due process right to maintain a building permit. 48 F.3d at 686. The Second Circuit found that it was reasonable for town officials to believe that they were entitled to revoke the building permit, which action was clearly within the scope of their authority, although the revocation was later held to be improper. *Id.* Here, on the other hand, if the jury were to find that an impermissible detention or seizure of Plaintiffs' persons occurred, such an action is not clearly permitted by the Building Code, or other state or village ordinance applicable in this case; and therefore, a rational jury could find that it was not objectively reasonable for Pierpont to believe he acted within constitutional or statutory bounds.

However, because of the defense of qualified immunity, the constitutionality of the Building Code is irrelevant. As was explained by the Second Circuit in *Laverne*, when government officials are acting in accordance with village ordinances, that such ordinances might later be declared invalid or unconstitutional, does not alter an official's objectively reasonable assumption that he was permitted to act in accordance with that ordinance. 522 F.2d at 1149 ("That [village officials'] actions would later be declared unconstitutional . . . was not an event which they could

reasonably foresee, and they should not be subjected to damage liability because they were not omniscient predictors of the uncertain course of constitutional law.") *See also Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) ("a police officer would be excuse[d] from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional...") Therefore, the Court is not persuaded that, to the extent the Building Code authorizes Pierpont's behavior at issue in this case, its constitutionality is relevant; and thus, a determination of that issue is not appropriate here.

### D. *SEARCH AND SEIZURE OF VAN AND PREMISES*

Plaintiffs allege that Defendants searched their workplace and vehicles in violation of the United States Constitution and the laws of the state of New York. (Compl.¶¶ 36–37.) Defendants challenge this allegation on two grounds. First, they argue that Plaintiffs do not have standing to assert a claim for improper search and seizure of the vans or Premises. Furthermore, Defendants assert that no improper search occurred.

■ To challenge the constitutionality of a vehicle search, Plaintiffs must illustrate "a legitimate basis for being in it, such as permission from the owner," but need not actually own the car itself. *See United States v. Ponce,* 947 F.2d 646, 649 (2d Cir.1991). Standing to challenge a search is therefore satisfied by either ownership of the vehicle or license from the owner to possess the vehicle. *United States v. Sanchez,* 635 F.2d 47, 64 (2d Cir.1980).

Although none of the Plaintiffs allege ownership of the vans at issue here, Franklin Dejesus explains that he was given permission to use one of the vehicles, the "grey van," by its owner, William Cul-

len. (*See* Deposition of Franklin Dejesus ("F. Dejesus Dep."), dated November 12, 2002, attached as Exh. Al to the Exhibit Binder, at 36.) Therefore, Franklin Dejesus would have standing to contest the search of that car if an unconstitutional search occurred. Plaintiffs, however, do not assert permissible use of the other van referred to in the Complaint, "Pedro's van," presumably because "Pedro" is not a party to this action. Therefore, Plaintiffs do not allege sufficient interest in that van to assert a claim for its improper search under the Fourth Amendment.

■ Furthermore, it is only "Pedro's van" that is alleged to have been illegally searched, not the "grey van." It is well settled that "[t]here is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either an inquisitive passerby or diligent police officers." *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *see also United States v. Ware,* 914 F.2d 997, 1000 (7th Cir.1990) ("[T]here is no expectation of privacy and thus no 'search' when a person merely observes something through an automobile's window.") Plaintiffs only provide evidence that one of the vans was searched internally—"Pedro's van." (*See* E. Dejesus Dep. at 61–62; F. Dejesus Dep. at 87.) The grey van was admittedly searched only through its window. (*See* F. Dejesus Dep. at 87–88.) Therefore, Plaintiffs can only maintain a claim as to that vehicle, "Pedro's van," for which they have not sufficiently alleged standing. Because Plaintiffs do not properly provide evidence of standing and an impermissible search with regard to either car, their search and seizure claim as to the vans at issue must be dismissed.

■ The only other claim made by Plaintiffs with regard to the "grey van," concerning which they have standing, is

that the confiscation of Franklin Dejesus's car keys without due process constituted a violation of the due process clause of the Fifth Amendment. *See Knox v. Salinas,* 193 F.3d 123, 126 (2d Cir.1999) (a car can not be confiscated without proper notice and a post-deprivation grievance proceeding). In response, Defendants argue that this claim is only valid with regard to Franklin Dejesus and that Franklin Dejesus consented to giving his keys to Pierpont. The Court agrees with the former argument that the due process claim is only valid with regard to plaintiff Franklin Dejesus, but believes there is an issue of material fact as to whether proper consent was garnered from Franklin Dejesus to have his keys allegedly taken and never returned. Specifically, Franklin Dejesus alleges that Pierpont "demanded" the keys and exerted his authority as a village official in taking them. (*See* F. Dejesus Dep. at 87; Pl. 56.1 Stmt. ¶ 8.) Defendants' argument that Franklin Dejesus admittedly consented to handing his keys to Pierpont is not persuasive or supported by the record. Therefore, it is a material issue of fact to be decided by a jury whether Pierpont confiscated the keys to the "grey van," whether in doing so proper notice and other due process requirements were satisfied and whether consent from Franklin Dejesus was properly obtained.

■ Defendants also argue that Plaintiffs have neither standing to assert a Fourth Amendment claim with regard to Pierpont's search of the Premises, nor was such a search improper. Plaintiffs do not counter these arguments. Accordingly, Plaintiffs' failure to raise an issue of material fact with regard to the Defendants' alleged unconstitutional search of the premises is dispositive of their claim. Moreover, as the Court has already noted, Pierpont inspected the Premises in accordance with the Building Code to determine whether Plaintiffs had a proper permit for the work they were conducting. There-

fore, regardless of the alleged unconstitutionality of the Building Code, Pierpont is protected by qualified immunity for inspecting the Premises since he was acting reasonably in accordance with the village ordinance.

### E. *LIABILITY OF THE VILLAGE OF PELHAM MANOR*

Plaintiffs allege that by reason of the policy, practice or custom of Pelham Manor not to adequately supervise or discipline Pierpont, it is liable for Pierpont's alleged constitutional violations. Defendants argue that no evidence has been put forward to establish that such a custom or policy existed; and therefore, the Complaint should be dismissed as against Pelham Manor.

A municipality may be held liable for the unconstitutional acts of a municipal employee under 42 U.S.C. § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell v. Dep't of Soc. Serv. of the City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Turpin v. Mailet,* the Second Circuit established that liability of municipal supervisors may be predicated on a policy of inaction or omission: "For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." 619 F.2d 196, 201 (2d Cir.1980). In other words, the pertinent

custom or policy need not be established by demonstrating that the municipality had an explicitly stated rule or regulation indicating such an omission; rather, a plaintiff can show that having been alerted to the unconstitutional actions of its employee, the municipality exhibited deliberate indifference in not addressing the infraction. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995); *Villante v. Dep't of Corrections*, 786 F.2d 516, 519 (2d Cir.1986).

■ Although a plaintiff need not provide direct evidence of the custom or policy at issue, "the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares*, 985 F.2d at 100 (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983); *Black v. Stephens*, 662 F.2d 181, 189 (3d Cir.1981); *Lewis v. Hyland*, 554 F.2d 93, 98 (3d Cir.1977)). Moreover, "the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Id.* In other words, the facts alleged and evidence in support must amount to more than mere allegations of a failure to train and a single incident of improper conduct by officials, especially if such officials are below the policymaking level. *See id.*

■ To prove deliberate indifference, the need for more or better supervision to protect against constitutional violations should have been apparent to the municipality. *See City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Vann*, 72 F.3d at 1049. Proof of repeated complaints against the accused official followed by the failure of any meaningful attempt on the part of the municipality to investigate or prevent further incidents is proper evidence of the failure to supervise, train and discipline.

*See Ricciuti*, 941 F.2d at 123; *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir.1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force."); *City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (the existence of a policy of failing to train or discipline can be found from a pattern of constitutional violations which so "so obvious" that it should have put the municipality on notice that further training of its employees was required). For instance, in *Sango v. City of New York*, the court held that proceedings held before the Civilian Complaint Review Board ("CCRB"), evidencing similar complaints against defendant officers, could be used to satisfy plaintiffs' burden for demonstrating deliberate indifference by the municipality. No. 83 Civ. 5177, 1989 WL 86995, at *10 (E.D.N.Y. July 25, 1989). Similarly, in *Fiacco v. City of Rensselaer*, the Second Circuit held that "[t]he City's knowledge of these allegations and the nature and extent of its efforts to investigate and record the claims were pertinent to Fiacco's contention that the City has a policy of non-supervision of this policemen that reflected deliberate indifference to their excessive use of force." 783 F.2d 319, 327–28 (2nd Cir.1986).

■ In this case, the proof submitted by Plaintiffs that there was a municipal policy to fail to train and discipline Pierpont is that he acted improperly on another instance *subsequent* to the events at issue here. Although Plaintiffs must demonstrate a causal connection between the policy at issue and the unconstitutional acts committed by the municipality's agent, "courts sometimes invoke subsequent behavior as circumstantial evidence of past behavior..." *See Liberty Envtl. Sys., Inc. v. The County of Westchester*,

No. 94 Civ. 7431, 2000 WL 1752927, at *2 (S.D.N.Y. Nov. 29, 2000). In this case, however, such subsequent evidence is too sparse to support a rational jury's finding that prior to the incident at issue here, a municipal policy of failing to train or discipline Pierpont existed. One subsequent incident of potential misconduct is hardly convincing proof sufficient to meet the high standard for establishing an overall policy of a municipality, especially where the alleged custom or regular practice entails unlawful conduct. *See Sango*, 1989 WL 86995, at *7 ("Although that standard [deliberate indifference] is undoubtedly difficult to meet ... we cannot say as a matter of law that failure to act may never give rise to an official policy within the meaning of *Monell.*")

Moreover, despite the general holding in *Liberty Envtl.* that subsequent acts may be probative of a preceding custom or policy, district courts in this Circuit directly addressing the specific issue of establishing deliberate indifference for the purpose of proving municipal liability have held that subsequent acts, standing alone or even in conjunction with other prior acts, are not probative of a prior municipal policy because they can not provide the necessary causal link between a custom or policy and the conduct at issue. For instance, the *Sango* court held that prior proceedings before the "conduct occurring after the incident at issue lacks the requisite 'affirmative link' to plaintiffs' injuries—that is, plaintiffs cannot establish causation." 1989 WL 86995, at *20. Accordingly, the *Sango* court would not allow evidence of subsequent conduct to be permitted *even* where prior conduct was also in evidence. *Id.* Similarly, in *Woo v. City of New York*, a court in this district held that plaintiff could not establish a causal connection between incidents that occurred after the event in question and a custom or policy of failure to discipline officers who used excessive force. No. 93 Civ. 7007,

1996 WL 457337, at *6 (S.D.N.Y. Aug.14, 1996); *see also Anderson v. City of New York*, 657 F.Supp. 1571, 1576 ("Plaintiff, however, must link the behavior in question to the policy of failure to discipline— for example, the officer must have known of the policy at the time he allegedly committed the civil rights violations.")

Similarly, in this case, even if Plaintiffs can prove that Pelham Manor did not properly discipline Pierpont with regard to the one subsequent act they refer to after a constitutional infraction took place, this one incident, on its own, can not sufficiently show either Pierpont's awareness of this policy of laxity towards his actions or a general overall policy that predated the incident at issue here. Therefore, while not reaching the issue of whether subsequent conduct might not, in some circumstances, be indicative of a prior policy of failing to supervise, this Court is persuaded that the one subsequent incident referred to by Plaintiffs is not sufficient to establish the causal link to an overall failure to supervise Pierpont by Pelham Manor necessary for a rational jury to find municipal liability in this case.

### F. DAMAGES

Finally, Defendants argue that Plaintiffs suffered no injuries as a result of the events that occurred on February 21, 2001 and that therefore, at most, Plaintiffs are only entitled to nominal damages, which Defendants request this Court determine as a matter of law. Defendants also request that the Court preclude attorney's fees as a matter of law since only nominal damages can be awarded. Plaintiffs counter that the issue of damages is a matter of fact to be decided by the jury. Plaintiffs claim actual damages for emotional distress resulting from the incident, a limited amount of economic loss injuries, as well as punitive damages and attorney's fees.

It is a basic tenet of civil rights law that compensable injuries may include not only monetary losses such as out-of-pocket expenses, but also injuries such as personal humiliation and mental anguish. *See Walz v. Town of Smithtown*, 46 F.3d 162, 169–170 (2d Cir.1995); *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir.1986); *Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Moreover, although physical injury resulting from emotional distress buttresses the basis for damages for such a claim, shock, anxiety, fear and humiliation alone have been determined to be sufficient to establish compensatory damages in civil rights cases. *See Walz*, 46 F.3d at 170 (testimony concerning plaintiffs' shock, discomfort and distress sufficient to warrant damages for emotional distress); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir.1985) (plaintiff's testimony at trial concerning her anguish, embarrassment, anxiety and humiliation sufficient to establish compensatory damages for emotional distress).

The Court notes, however, that the Second Circuit has recently held that emotional distress damages can not be established by mere subjective statements by the plaintiff, without corroboration, when the plaintiff does not indicate any physical manifestations of her distress. *See Annis v. County of Westchester*, 136 F.3d 239, 249 (2d Cir.1998). In summarizing the plaintiff's failure, the *Annis* court indicated that the plaintiff had failed to "establish that she suffers from any concrete emotional problems." *Id.* Defendants cite *Dasher v. Hughes*, for the proposition that physical manifestations are necessary for recovery of emotional distress damages.[4] No. 95 Civ. 3913, 2000 WL 726865, at *9 (S.D.N.Y. June 6, 2000). However, this interpretation of *Annis* has been expressly rejected by the Second Circuit itself. In *Patrolmen's Benevolent Assoc. of the City of New York v. the City of New York*, in reviewing an amended jury instruction in which the district court first indicated that a physical manifestation of emotional distress was necessary, but then amended the instruction to state that emotional distress could be proved either by physical manifestations or by the plaintiff's testimony "corroborated by other testimony," the Second Circuit held that "*Annis* should not be read to require physical symptoms of emotional distress in cases brought pursuant to 42 U.S.C. § 1983." 310 F.3d 43, 56 (2d Cir.2002).

The *Patrolmen's* court further elaborated on the evidentiary requirements to justify an award for emotional distress. *Id.* at 55. The mere fact of a constitutional deprivation does not of itself justify an award for such damages. *Id.* Furthermore, "[a] plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages." *Id.* Detailing the type of additional evidence that may be sufficient to satisfy the *Annis* standard, the Court pointed to: (1) "other evidence that such an injury occurred, such as testimony of witnesses to the plaintiff's distress," *Id.* (citing *Miner*, 999 F.2d at 663) and (2) "objective circumstances of the violation itself," *Id.* (citing *Miner*, 999 F.2d at 663 and *Walz*, 46 F.3d at 170). The Second Circuit specifically instructed that evidence that the plaintiff has sought medical treatment for the alleged injury is helpful but not required. *Id.* (citing *Miner*, 999 F.2d at 663.)

District courts in this Circuit interpreting *Annis* have generally understood the

---

4. The *Dasher* court, although directly citing a law review article, is essentially relying on the holding in *Annis*, since that is the principal case relied upon by the law review article cited. *Id.*

Second Circuit's holding as not requiring a specific kind of support to justify emotional distress damages; but rather, have read it narrowly in the context of the Second Circuit's other precedents to hold that the holding in *Annis* is based on the particularly minimal evidence provided by the plaintiff in that case. *See Mahoney v. Canada Dry Bottling Co. of New York/ Coors Distrib. Co. of New York*, No. 94 Civ. 2924, 1998 WL 231082, at *5 (E.D.N.Y. May 7, 1998) ("The Court is not convinced that *Annis* should be read so broadly as to preclude any award of compensatory damages for mental anguish absent corroborating testimony."); *Uddin v. New York City/Admin. for Children's Services*, No. 99 Civ. 5843, 2001 WL 1512588, at * 6 (S.D.N.Y. Nov.28, 2001) ("[T]he *Annis* Court itself indicated that its holding was based on the nature of plaintiff's testimony, rather than the absence of corroboration, explaining that 'her testimony fails to establish that she suffers from any concrete emotional problems.'") Moreover, district courts have held that as long as testimony points to concrete emotional problems, such testimony may suffice to justify emotional distress damages. *See Uddin*, 2001 WL 1512588, at *6 (plaintiff's testimony relating concrete emotional problems such as depression and malaise sufficient to justify award for compensable damages); *Mahoney*, 1998 WL 231082, at *5 (testimony regarding anxiety and sleeplessness for a period of three months, with some corroboration by other witnesses, sufficient to justify award of compensatory damages).

■ Despite these narrow interpretations of *Annis*, it is still the case that in order to justify recovery for emotional distress, Plaintiffs must present sufficient evidence that they experienced "concrete emotional problems" and mere subjective statements by a plaintiff concerning feelings of anguish or humiliation, without any physical effects of such distress, or corrob-

orating evidence or other supporting evidence, are insufficient. *Annis*, 136 F.3d at 249. The Court agrees with Defendants that only minimal compensatory damages appear to be at issue here, and that the evidence supporting such damages is scant. The alleged detention in this case was relatively brief, and none of the Plaintiffs allege having suffered any physical harm, threat of physical harm or serious physical manifestations of their psychological harm. Rather, Plaintiffs allege emotional distress generally in the form of nervousness, an inability to concentrate, insecurity, depression and humiliation. (*See* Ortiz Dep. at 101–103; Pirrental Dep. at 54; F. Dejesus Dep. at 101–102; E. Dejesus Dep. at 72–73). Pena does relate somewhat more concrete problems from the alleged psychological harm in the form of loss of sleep and appetite (*See* Pena Dep. at 59–60.)

■ In any event, the law is clear that absent a finding that plaintiffs can produce no evidence to substantiate their claims for emotional distress, the existence of mental anguish damages is a matter of fact to be determined by a jury. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708–11, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999); *Dasher*, 2000 WL 726865, at *8. The Court, therefore, is not persuaded that it is proper to deny damages as a matter of law at this point in the proceedings and will allow Plaintiffs an opportunity to present evidence substantiating their emotional distress at trial. *See Annis*, 136 F.3d at 249 (despite finding that evidence presented at first trial was insufficient to substantiate award of damages for mental anguish, court instructs that Annis be "permitted to present other evidence of her emotional problems on remand."); *Ortiz–Del Valle v. Nat'l Basketball Assoc.*, 42 F.Supp.2d 334, 341 (S.D.N.Y.1999) ("Should plaintiff elect a

new trial, rather than accept the remittitur, she will be permitted to present evidence of emotional distress.")

In addition, Ortiz, Pirrental and Pena testified that because of the incident at issue here, they were damaged financially by their reluctance to return to the Premises. However, Pena and Pirrental testified that they were paid for the days that they missed, and therefore these damages would not be doubly recoverable. (*See* Pena Dep. at 59–60; Pirrental Dep. at 55.) Moreover, Ortiz testified that he only missed work for two or three days. (*See* Ortiz Dep. at 96; Pirrental Dep. at 51.) Therefore, only very minimal economic damages are at stake here.

Punitive damages are properly awarded when evidence of malice or careless indifference to a plaintiff's federally protected rights is demonstrated. *See* 42 U.S.C. § 1981a(b)(1); *Luciano v. Olsten Corp.*, 110 F.3d 210, 219–220 (2d Cir.1997); *Dasher*, 2000 WL 726865, at *10 ("To be entitled to punitive damages, [the plaintiff] must adduce evidence that defendant's pat-down search was conducted maliciously or with reckless or callous indifference to his rights.") Given the serious infractions on Plaintiffs' rights that are alleged, namely an impermissible arrest or detention by a village official who lacks authority to detain, at this stage the Court is not persuaded that punitive damages should be precluded as a matter of law.

Moreover, since at this stage in the proceedings the Court leaves open the possibility that Plaintiffs will be able to prove both liability and damages, the Court will not preclude an award of attorney's fees as a matter of law.

### III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that Defendants' motion for summary judgment is granted with regard to Plaintiffs' second cause of action in the Complaint, attributing liability for Pierpont's actions on the Village of Pelham Manor; and therefore, the Complaint is dismissed with regard to the Village of Pelham Manor; and it is further

**ORDERED** that Defendants' motion for summary judgment is granted with regard to the third cause of action in the Complaint, alleging violations of Plaintiffs' Fourth Amendment rights on account of Pierpont's search of the Premises, as defined above, and the two vans that were parked outside the Premises on February 21, 2001; and it is further

**ORDERED** that Defendants' motion for summary judgment is granted with regard to the fifth cause of action in the Complaint as to Eugenio Dejesus, Pirrental, Ortiz and Pena, but survives with regard to Franklin Dejesus.

**ORDERED** that Defendants' motion for summary judgment is otherwise denied; and it is finally

**ORDERED** that the remaining parties to this action appear at a pre-trial conference before the Court on September 26, 2003 at 11:45 a.m. in Courtroom 905 at the United States Courthouse, 40 Centre Street, New York, New York.

**SO ORDERED.**